## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **HOLY CROSS, ET AL.** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 03-370** |
| **UNITED STATES ARMY CORPS OF ENGINEERS** | * | **SECTION "L" (4)** |

## ORDER AND REASONS

Before the Court are the Plaintiffs' Motion for Summary Judgment on Their Second Claim For Relief (Rec. Doc. 82), the Defendant's Cross Motion for Summary Judgment (Rec. Doc. 85), and the Defendant's Motion to Limit Review to the Administrative Record (Rec. Doc. 84).   The Court heard oral argument and took these motions under submission.  Also before the Court is the Defendant's Motion to Set Aside the Court's Order Granting Plaintiffs' Ex Parte Motion for Consideration of Supplemental Authority (Rec. Doc. 105).   The Court is now ready to rule on all of these motions.

## I.      BACKGROUND

This litigation arises from the United States Army Corps of Engineers' ("Corps") decision to modernize the lock in the Inner Harbor Navigational Canal, known locally as the Industrial Canal.  The Industrial Canal is a five-mile link just east of New Orleans in the navigational system that connects the Gulf Intracoastal Waterway and the Mississippi River-Gulf Outlet ("MR-GO")[1] with the Mississippi River and Lake Pontchartrain in southeast Louisiana.

---

[1]      The MR-GO was completed in the 1960s.  It is a 76-mile navigation channel which extends from the Industrial Canal to the Gulf of Mexico.  During Hurricane Katrina, the MR-GO acted as a funnel through which floodwaters surged into the Industrial Canal.  A separate lawsuit in this Court seeks "to appoint a Special Master and a panel of distinguished scientific experts" to address "the MR-GO's hazardous conditions."  *See Savoy v. United States of America*, No. 06-3552 (filed July 12, 2006).

Navigation traffic passes through the Industrial Canal by means of a lock that was completed in 1923 by the Port of New Orleans.  The current lock is 75 feet wide, 640 feet long, and 31.5 feet deep.

In the River and Harbors and Flood Control Act of 1956, Pub. L. No. 84-455, 70 Stat. 65, Congress authorized the Corps to construct the MR-GO and also provided that "when economically justified by obsolescence of the existing industrial canal lock, or by increased traffic, replacement of the existing lock or an additional lock with suitable connections is hereby approved."[2]

Since the 1960s, the Corps has been contemplating a modernization of the existing lock in the Industrial Canal (the "Project").  Navigational delays were common due to the high volume of traffic compared to the lock's capacity and the effects of three bridges that cross the canal in the vicinity of the lock.  The bridges at St. Claude Avenue, Claiborne Avenue, and Florida Avenue carry heavy vehicular traffic and their operation affects the ingress to and egress from the lock.  These bridges are closed to navigation during morning and afternoon rush hours because they are major commuter routes into and out of New Orleans for those living on the east side of the canal.  Delays mean higher transportation costs for the cargo being shipped through the lock and ultimately higher costs to the general public.  In addition to relieving these delays, a deeper and wider canal would allow larger barges and deeper draft vessels to navigate the region and reach various port facilities along the local waterways.

─────────────────

[2]   Congress amended and supplemented the authorization for the lock modernization project several times.  *See* Water Resources Development Act of 1976, Pub. L. No. 94-587, § 186, 90 Stat. 2917, 2941-42; Water Resources Development Act of 1986, Pub. L. No. 99-662, § 844, 100 Stat. 4082, 4177; Water Resources Development Act of 1996, Pub. L. No. 104-303, § 326, 110 Stat. 3658, 3717.

After decades of study, the Corps issued a final Environmental Impact Statement ("EIS") in March 1997 that analyzes the environmental and economic impacts of several alternative plans for the Project.  The EIS prepared by the Corps in this case consists of nine volumes: Volume 1 contains the evaluation report; Volume 2 contains the community impact mitigation plan; Volumes 3 through 8 contain technical appendices; and Volume 9 contains public views and the Corps' responses.

Specifically, the EIS considers three potential courses of action with respect to the Project:  (1) a "no-action" alternative; (2) a "bridge-only" plan; and (3) a "new lock" plan.  The "no-action" alternative would involve maintenance and rehabilitation of the existing lock.  The "bridge-only" plan would involve construction of a new bridge across the Industrial Canal at St. Claude Avenue that is high enough to allow most vessels to pass through without opening the bridge, thereby improving both vehicular and vessel traffic.  The "new lock" plan represents a series of plans to construct a new lock of one of several different sizes within the existing right-of-way of the Industrial Canal at a site north of Claiborne Avenue.

On December 18, 1998, the Corps issued a Record of Decision ("ROD") adopting the "new lock" plan discussed in the EIS and committing to build a new lock that will be 1,200 feet long, 110 feet wide, and 36 feet deep.  The Project will involve:

(1)  demolition of the Galvez Street wharf, the United States Coast Guard facility, and other businesses along the east bank of the Industrial Canal;

(2)  excavation of the east bank for a temporary bypass channel;

(3)  dredging the canal bottom and driving piles for the new lock;

(4)  disposing of approximately three million cubic yards of dredged sediments and soils

into the Mississippi River, at a mitigation site for wetlands creation, at an existing confined

disposal area located adjacent to the MR-GO, and/or as backfill during construction of the new

lock;

       (5)  off-site construction of four lock modules that will be floated in and ballasted in

place to form the new lock; and

       (6)  demolition of the existing lock.

The Corps estimates that the Project will cost more than $600 million and take over 10 years to

complete.

       Concerns regarding the scope and accuracy of the EIS led several citizen groups to

formally request a supplemental EIS from the Corps.  One such group was the Holy Cross

Neighborhood Association, which is a non-profit corporation composed of residents of the Holy

Cross neighborhood.  The Holy Cross neighborhood borders the Industrial Canal lock to the east.

Holy Cross is a national historic district, as is the Bywater neighborhood which borders the

Industrial Canal lock to the west.  Other residential neighborhoods bordering the canal include

St. Claude and the Lower Ninth Ward.

## II.  PROCEDURAL HISTORY

       Unsatisfied with the Corps' response to its concerns, the Holy Cross Neighborhood

Association brought suit on February 6, 2003, seeking a declaratory judgment and injunctive

relief to enjoin the Corps from dredging, stirring up, releasing, and disposing of allegedly

hazardous waste-contaminated sediments of the canal.  The Gulf Restoration Network and the

Louisiana Environmental Action Network joined Holy Cross (collectively, "Plaintiffs") in the

First Amended and Superseding Complaint.  Both organizations are non-profit corporations

comprised of various environmental and citizen groups from the Gulf of Mexico region.

The Plaintiffs contend that the Project endangers Lake Pontchartrain and the surrounding environment because dredging the Industrial Canal will release hazardous waste-contaminated sediment into the ecosystem and will require storage and maintenance of the hazardous material which will create other problems.  The Plaintiffs argue that the EIS prepared by the Corps is insufficient because it fails to account for significant adverse affects the Project will have on the environment, the economy, and the safety and welfare of the communities surrounding the Industrial Canal.  The Plaintiffs do not seek to cancel the Project, but believe that further analysis and planning is required prior to its implementation.

The Plaintiffs' Second Amended Complaint asserts three causes of action.  First, under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k, the Plaintiffs allege that the Corps has contributed or is contributing to the past or present handling, storing, treatment, transportation, or disposal of solid and hazardous waste which may present an imminent and substantial endangerment to health or the environment.  Second, under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, the Plaintiffs claim that the EIS prepared by the Corps is inadequate and that the Court has the authority to compel the Corps to comply with the requirements of NEPA pursuant to the Administrate Procedure Act ("APA"), 5 U.S.C. §§ 702, 706.  Third, the Plaintiffs claim that the Corps failed to file a supplemental EIS when potential adverse impacts were brought to its attention.

On November 3, 2003, this Court held that the Plaintiffs have standing to bring these claims.  On that date, the Court also denied the Corps' motion to dismiss the Plaintiffs' RCRA claim for lack of subject matter jurisdiction and for failure to state a claim.

5

On August 10, 2004, the Plaintiffs filed a motion for summary judgment on their RCRA and NEPA claims.  However, on August 20, 2004, the Court granted the Corps' motion to stay proceedings and therefore declined to consider the Plaintiffs' motion for summary judgment at that time.  The Corps sought the stay so that it could conduct further testing and analysis of the canal sediment in an attempt to resolve this litigation.  The Court ordered as a condition of the stay that the Corps agree not to commence dredging and/or disposal of canal sediment during the pendency of the stay.  The parties subsequently entered into a consent agreement to this effect.

Following several extensions of the stay, including an extension due to Hurricane Katrina, the Corps informed the Court on February 22, 2006 of its intention to proceed with the Project.  The Plaintiffs also informed the Court on this date that the Holy Cross neighborhood was likely to be repopulated.  Therefore, the Court partially lifted the stay so that the parties could file motions for summary judgment.

Accordingly, on March 22, 2006, the Plaintiffs filed the instant motion for summary judgment on their second claim for relief.  The gravamen of the Plaintiffs' second claim for relief is that the Corps issued its EIS and ROD without gathering key information necessary to assess the environmental impacts from dredging the Industrial Canal and disposing of dredged material in the sensitive southeastern Louisiana ecosystem, as required by NEPA.  Specifically, the Plaintiffs allege that the Corps failed to determine:  (1) the scope of contamination of the sediments to be dredged; (2) the risks that stirring up, dredging, and disposing of contaminated sediments pose to the public and environment; (3) standards for management of contaminated sediments; (4) key characteristics of the Corps' facility for containing contaminated sediments in a sensitive coastal ecosystem such as how long the disposal facility will last, whether it will

withstand hurricanes, and how much contamination it will routinely discharge; and (5) alternatives for safely dredging and managing contaminated sediments.

On March 22, 2006, the Corps also filed a Certified Index to the administrative record. The Index lists 1,101 documents that comprise the administrative record in this case.

On May 5, 2006, the Corps filed a cross motion for summary judgment on the Plaintiffs' NEPA claim.  The Corps argues that it has addressed the Plaintiffs' concerns to the extent required by NEPA and that its EIS is therefore sufficient.

Three days later, the Corps filed a motion to limit this Court's review to the administrative record.  The Corps asks the Court not to consider the post-decision, extra-record materials submitted by the Plaintiffs in support of their motion for summary judgment.  To this effect, the Corps also filed a motion to set aside the Court's July 14, 2006 Order granting the Plaintiffs' ex parte motion to consider a May 8, 2006 application by the Corps to the State of Louisiana for a permit allowing it to perform maintenance dredging in the Industrial Canal.

## III.    LAW AND ANALYSIS

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Amburgey v. Corhart Refractories Corps.*, 936 F.2d 805, 809 (5th Cir. 1991).  Because the Court may not "find" underlying facts in this administrative record review proceeding, there are no material facts essential to the Court's resolution of this action.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990).

The Plaintiffs' second claim for relief arises under NEPA.  Congress stated that the

7

purpose of NEPA is to "declare a national policy which will encourage productive and enjoyable

harmony between man and his environment; to promote efforts which will prevent or eliminate

damage to the environment and biosphere and stimulate the health and welfare of man; [and] to

enrich the understanding of the ecological systems and natural resources important to the

Nation."  42 U.S.C. § 4321.

NEPA ensures that federal agencies "'carefully consider detailed information concerning

significant environmental impacts,' and at the same time 'guarantee[s] that the relevant

information will be made available to the larger audience that may also play a role in both the

decisionmaking process and the implementation of that decision.'"  *Sabine River Auth. v. United

States Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992) (quoting *Robertson v. Methow Valley

Citizens Council*, 490 U.S. 332, 349 (1989)).  As the United States Court of Appeals for the Fifth

Circuit further explained:

> [NEPA] is a procedural statute that demands that the decision to go forward with a
> federal project which significantly affects the environment be an environmentally
> conscious one.   The statute does not command the agency to favor an
> environmentally preferable course of action, only that it make its decision to proceed
> with the action after taking a "hard look at environmental consequences."

*Id.* (quoting *Robertson*, 490 U.S. at 350).

NEPA requires a federal agency to prepare an EIS as part of any "major Federal actions

significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see also

Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 72 (2004).  Among other things, the EIS

must address (1) the environmental impact of the proposed action, (2) any adverse environmental

effects which cannot be avoided should the proposal be implemented, and (3) alternatives to the

proposed action.  *See* 42 U.S.C. § 4332.

8

NEPA does not contain its own standards for judicial review; therefore, the Corps' action in this case is reviewed under the general provisions of the APA.  *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 & n.23 (1989).  Under the APA, a reviewing court shall uphold agency action unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706; *Lujan*, 497 U.S. at 879.  In applying this standard, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Sierra Club v. United States Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001).  The Corps asks the Court to adhere to the "record rule" in this case and look no further than the 1997 EIS and the 1998 ROD.

Specifically, the Corps asks the Court not to consider the post-decision, extra-record materials submitted by the Plaintiffs in support of their motion for summary judgment.  The Corps objects to consideration of Exhibits C-K to the Plaintiffs' memorandum in support of their motion for summary judgment, which consist of (1) contractor reports, deposition testimony, and responses to requests for admission demonstrating that the Corps is aware of certain carcinogenic compounds present in the canal's sediment and (2) a declaration by a geologist, Mr. Barry Kohl, that summarizes the Corps' sediment disposal plan, opines on its sufficiency, and describes the impacts of Hurricane Katrina.  The Corps argues that these materials are unnecessary and cumulative.

As the Fifth Circuit has explained, "NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and

review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record." *Sierra Club v. Peterson*, 185 F.3d 349, 370 (5th Cir. 1999); *see also* Susannah T. French, Comment, *Judicial Review of the Administrative Record in NEPA Litigation*, 81 Cal. L. Rev. 929 (1993).  Indeed, "[t]he omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omission to its attention." *Peterson*, 185 F.3d at 370.

The first category of extra-record documents submitted by the Plaintiffs confirm a fact that is beyond dispute, namely that contaminants, including heavy metals and polycyclic aromatic hydrocarbons ("PAHs"), are present in the Industrial Canal sediments.  Despite having taken only four or five sediment samples prior to issuing its EIS, the Corps acknowledges in the EIS that the canal sediment is contaminated.  *See, e.g.*, Def.'s ex. 2, EIS Vol. 1, Main Report and Environmental Impact Statement, at US000038, US000211.

The other extra-record material, the declaration of Mr. Barry Kohl, sheds light on the real issue in this case.  The EIS was completed in 1997 and the details of the Corps' decision to modernize the Industrial Canal lock were set forth in the 1998 ROD.  However, the effects of Hurricane Katrina have exposed the inadequacy of the Corps' planning and analysis.  Moreover, in the year since Hurricane Katrina, local circumstances have drastically changed:  the future of the MR-GO is in doubt; the location, height, and significance of the levees are being re-evaluated; and priorities are shifting from the transportation needs of the community to the restoration of basic infrastructure.  All of these post-Katrina developments expose the insufficiency of the present EIS.  To ignore these facts is to ignore reality.  For the law to have any credibility or respect, it must be grounded in reality.

The Corps' plan to dispose of the contaminated sediments in confined disposal sites provides a stark example of this changed world.  A confined disposal site is an engineered structure designed to provide required storage volume and to meet required effluent solids standards for dredged material.  Prior to Hurricane Katrina, the MR-GO confined disposal area was surrounded by berms, hurricane protection levees, and confinement dikes.  However, an independent study sponsored by the National Science Foundation found that there were seventeen post-Katrina breaches along the levee which borders the MR-GO.[3]

This levee was the main protection for the area that includes the proposed disposal sites and many of the breaches were catastrophic.  In his declaration, Mr. Kohl describes the events following the storm:

> High velocity erosional waters from the levee failure inundated the interior wetlands causing overtopping and breaching of the secondary St. Bernard protection levee. These waters also inundated proposed disposal sites and Highway 47 which passes through the area. Thus, if the Corps had disposed of contaminated sediments in the facilities prior to Hurricane Katrina, those sediments could have been resuspended by flood waters and redistributed in wetlands causing widespread environmental contamination.

*See* Pl.'s ex. H.

The Corps argues that in 1997, it obviously "could not have considered the impacts of Hurricane Katrina."  However, the EIS does not adequately address the risks of flooding and hurricanes in general.  The Corps does not specify how long it envisions the disposal facilities to last, nor has it specified its plans for the level of a storm event that the facilities will be able to withstand.  Therefore, there is no way to know what environmental impacts these facilities will

---

[3]   *See* R.B. Seed, et al., Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005 (July 31, 2006), *available at* http://www.ce.berkeley.edu/~new_orleans/ (last visited Sept. 18, 2006).

have on the ecosystem.  Of the thousands of pages in the administrative record, only a few

paragraphs mention hurricane protection and flood control.  *See, e.g.*, Def.'s ex. 2, EIS Vol. 1,

Main Report and Environmental Impact Statement, at US000127 (describing need to extend

floodwalls to tie in new lock), US000226-US000227 (describing need to upgrade floodwalls

along the canal due to higher river stages in the new lock); Def.'s ex. 4, EIS Vol. 3, Evaluation

Report, Engineering Investigations, at US000644-US000649 (discussing historical flooding

trends).  These brief discussions are limited to changes to the walls of the canal.

Moreover, the Corps has recently adopted alternative dredging and disposal methods for

a new maintenance project in the same waters of the Industrial Canal to alleviate shoaling that

occurred following the passage of Hurricanes Katrina and Rita.  *See* Pl.'s ex. L, Public Notice,

Proposed Maintenance Dredging of the Gulf Intracoastal Waterway (GIWW), Inner Harbor

Navigation Canal, Orleans Parish, LA (May 16, 2006).  For this project, the Corps intends to use

an "environmental clamshell bucket dredge designed to minimize re-suspension of sediment

during the dredging operation" and will dispose of the contaminated sediment into a "Louisiana

Department of Environmental Quality-permitted Type I landfill" rather than at a confined

disposal site.  *Id.*  Apparently, even the Corps is now questioning the conclusions it reached in its

1997 EIS.

The Court recognizes that "[a]lthough [the] inquiry into the facts is to be searching and

careful, the ultimate standard of review is a narrow one" in this case and that it is "not

empowered to substitute its judgment for that of the agency."  *Citizens to Preserve Overton

Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971).  However, this is not a case of conflicting

evidence, nor one in which the Court seeks to substitute its judgment for that of the Corps.

Rather, the Corps' current actions suggest that it may have already abandoned the position it seeks to defend in this case.  In any event, Hurricane Katrina has exposed the inadequacies of the EIS and raised questions about the importance and priority of the whole Project.

The Court finds that the Corps failed to take a "hard look" at the environmental impacts and consequences of dredging and disposing of the canal's contaminated sediment and should revisit the Project in light of recent catastrophic events.  The extra-record materials submitted by the Plaintiffs merely shed light on this fact.  Notably, the EIS does not consider the reasonable dredging and disposal alternatives that the Corps has recently adopted for maintenance dredging of the same waters.  In light of Hurricane Katrina, the underlying purpose of NEPA will not be served if the Corps moves forward with the Industrial Canal Project according to a plan devised almost a decade ago.[4]  Without further study and planning, the Project cannot be considered "environmentally conscious."  *See Sabine River Auth.*, 951 F.2d at 676.

## IV.   CONCLUSION

For the foregoing reasons, IT IS ORDERED that the Corps' Motion to Limit Review to the Administrative Record (Rec. Doc. 84) and Motion to Set Aside the Court's Order Granting Plaintiffs' Ex Parte Motion for Consideration of Supplemental Authority (Rec. Doc. 105) are DENIED.

---

[4]   The Plaintiffs' third claim for relief, which is not presently before the Court, asserts that the Corps failed to supplement its EIS *prior* to Hurricane Katrina.  The NEPA-created Council on Environmental Quality has promulgated the following regulation dealing with environmental impact statements:  "Agencies [s]hall prepare supplements to either draft or final environmental impact statements if . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c).  Without addressing the Plaintiffs' third claim for relief, the Court notes that the Corps, at a minimum, must prepare a supplemental EIS addressing the significant new circumstances relevant to environmental concerns that have arisen since Hurricane Katrina.

IT IS FURTHER ORDERED that the Plaintiffs' Motion for Summary Judgment on Their Second Claim For Relief (Rec. Doc. 82) is GRANTED and the Corps' Cross Motion for Summary Judgment (Rec. Doc. 85) is DENIED.  Accordingly, the Corps is ENJOINED from continuing with the Project until it complies with NEPA.

New Orleans, Louisiana, this 3rd day of October, 2006.

UNITED STATES DISTRICT JUDGE