# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HOLY CROSS NEIGHBORHOOD | * | |
| ASSOCIATION | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 03-370 |
| | * | Ref. 10-1715 |
| UNITED STATES ARMY CORPS OF | * | |
| ENGINEERS | * | SECTION "L"(4) |

## ORDER & REASONS

Before the Court are two cross-motions for summary judgment: (1) Plaintiffs Holy Cross Neighborhood Association, Gulf Restoration Network, Louisiana Environmental Action Network, Citizens Against Widening the Industrial Canal, and Sierra Club's Second Motion for Summary Judgment (R. Docs. 176, 187), and (2) the U.S. Army Corps of Engineers' Cross-Motion for Summary Judgment (R. Doc. 192). The Court has received and reviewed the briefs and heard from the parties on oral argument. After considering the arguments raised, as well as the applicable facts and law, the Court is ready to rule. For the following reasons, IT IS ORDERED that Plaintiffs' Second Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART and the Corps' Cross-Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

## I.    BACKGROUND

The Inner Harbor Navigation Canal ("Industrial Canal or IHNC") is a manmade waterway that provides access from Lake Pontchartrain and the Gulf Intercoastal Waterway to the Mississippi River at New Orleans, Louisiana. *See Holy Cross Neighborhood Ass'n v. U.S. Army Corps of Eng'rs*, 455 F.Supp.2d 532, 534 (E.D. La. 2006). Navigation traffic passes

1

through the Industrial Canal by way of a lock that was completed in 1923 by the Port of New Orleans. *Id.*

In the River and Harbor Act of 1956, P.L. 455, 84th Congress, 2nd Session, Congress authorized construction of a replacement lock. The Corps began to study the building of a new lock and connecting channel in 1960. *Holy Cross*, 455 F.Supp.2d at 534. In 1997, the Corps issued a final Environmental Impact Statement ("EIS") that analyzes the environmental and economic impacts of several alternatives for the replacement lock project ("Project"), and signed a record of decision, adopting a deep-draft plan for replacing the lock. *Id.* at 535. The Project involves "disposing of approximately three million cubic yards of dredged sediments and soils" into nearby waterbodies and/or using it as backfill for the new lock. *Id.* "[C]ontaminants, including heavy metals and polycyclic aromatic hydrocarbons ("PAHs"), are present in the Industrial Canal sediments." *Id.* at 538-39.

In 2003, Holy Cross Neighborhood Association, Gulf Restoration Network, and Louisiana Environmental Action Network filed a complaint challenging the 1997 EIS and record of decision. (R. Doc. 1). In 2006, the Court enjoined the Corps from continuing with the Project until the agency prepared a supplemental EIS. *Id.* at 540. The Court based the injunction upon its finding that the 1997 EIS "failed to take a 'hard look' at the environmental impacts and consequences of dredging and disposing of the canal's contaminated sediment" as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332. *Id.* at 540. The Court criticized the EIS for failing to consider "the reasonable dredging and disposal alternatives that the Corps ha[d] recently adopted for maintenance dredging of the same waters," and failing to "adequately address the risks of flooding and hurricanes in general." *Id.* at 539-41.

2

Pursuant to the Court's 2006 decision, the Corps prepared a supplemental EIS ("SEIS"). *See* (R. Doc. 157)(SEIS).  The SEIS was finalized in March 2009.  The SEIS considers three deep-draft lock alternatives, in addition to a no-build/deauthorization alternative.  The deep-draft lock alternatives include: (1) the 1997 EIS's recommended plan, (2) a cast-in-place plan, and (3) a float-in-place plan, the latter of which was selected in the SEIS as the Recommended Plan. Additionally, the SEIS considers two alternatives for dredging the sediment necessary for a deep-draft canal, (1) bucket dredging, and (2) hydraulic dredging, selecting the latter.  Finally, the SEIS considers three alternatives for disposing of the dredged sediment produced by excavating the deep-draft canal, (1) disposal in a confined disposal facility ("CDF"), (2) disposal of some material in a CDF and the remainder in the Mississippi River, and (3) disposal of some material in a landfill and the remainder in the Mississippi River.  The second alternative was selected.

The Corps then issued a Record of Decision ("ROD") on May 20, 2009.  The ROD, mirroring the SEIS, adopted the, (1) float-in-place plan, (2) hydraulic dredging, and (3) disposing of dredged material unsuitable for open water discharge in a CDF and for material determined to be suitable for freshwater disposal, in the Mississippi River.

On January 19, 2010, Plaintiffs sent a Notice of Violation to the Corps.  *See* 33 U.S.C. § 1365(b)(1)(A) (2006); *see also* 40 C.F.R. pt. 135.  Plaintiffs did not receive a response, and on June 10, 2010, filed the present suit against the Corps, alleging the following causes of action: (1) the Corps' action violated the Court's 2006 Order; (2) the Corps' action violated NEPA; and (3) the Corps' action violated the Clean Water Act ("CWA") citizen-suit provision, 33 U.S.C. § 1365(a)(1).  On June 25, 2010, the Court ordered that this suit challenging the SEIS be

consolidated with the prior case.  (R. Doc. 140).

On October 5, 2010, the Corps filed a partial Motion to Dismiss for Lack of Jurisdiction, pertaining to the CWA citizen-suit claims in Plaintiffs' Complaint.  (R. Doc. 146).  After receiving briefing from the parties, and hearing oral argument, the Court granted the Corps' Motion, dismissing the citizen-suit claims without prejudice. *See* (R. Doc. 178).

On April 15, 2011, Plaintiffs filed a First Amended Complaint, removing their CWA-citizen suit claims to reflect the Court's order dismissing these claims, and adding a claim under the Administrative Procedure Act for violation of the EPA's Section 404(b)(1) Guidelines.  (R. Doc. 189).  The Corps filed an Answer, raising affirmative defenses of lack of jurisdiction and failure to state a claim.  (R. Doc. 194).

## II.   PRESENT MOTIONS

### A.   Plaintiffs' Second Motion for Summary Judgment

Plaintiffs filed a Second Motion for Summary Judgment, seeking an order from the Court vacating and remanding the Corps' SEIS and ROD, as well as enjoining the Corps from continuing with the Project until the Corps complies with NEPA and the CWA. *See* (R. Docs. 176, 187).  Plaintiffs make the following claims in their Motion.  First, Plaintiffs allege the following violations of NEPA arising from the SEIS: (1) the Corps' failure to consider the potential of a shallow-draft alternative to reduce the volume of contaminated, dredged sediment; (2) the range of lock alternatives the Corps did consider was too narrow; (3) the Corps rejected bucket dredging without considering its use for a shallow-draft lock project; (4) the Corps rejected landfill disposal of the project's most contaminated sediment without considering its use for a shallow-draft project; (5) the Corps failed to quantify the risk of the CDF overtopping and

4

releasing contaminated sediment into the Lake Pontchartrain Basin; and (6) rather than conducting a new alternatives analysis, the Corps incorporated by reference many of the 1997 EIS's faulty conclusions about the Project's impacts.

Second, Plaintiffs claim the Corps' SEIS violates the CWA's mandatory 404(b)(1) guidelines because: (1) the Corps has not selected the least environmentally damaging lock size, dredging, and disposal alternatives that still meet the basic project purposes; (2) the Corps has not offered a non-arbitrary reason for installing a deep-draft lock; and (3) the project's discharge of pollutants will violate an applicable Louisiana water quality standard.

Third, Plaintiffs argue that the Corps' SEIS violates the Court's 2006 Order, which, as noted above, enjoined the Project until compliance with NEPA.

### B.    The Corps' Cross-Motion for Summary Judgment (and Response)

The Corps filed a Cross-Motion for Summary Judgment, which is essentially identical to the Corps' Response in opposition to Plaintiffs' Motion for Summary Judgment, *see* (R. Doc. 192-1); thus, the two will be addressed together.  (R. Docs. 192, 193).  The Corps claims its SEIS fully complies with NEPA because it took a good-faith, hard look at sediment contamination and potential risks associated with hurricanes and flooding, including environmental and human impacts.  It claims it refined dredging and disposal plans by evaluating an appropriate range of alternatives.  Further, it claims it undertook extensive evaluation of impacts associated with the deep-draft plan by considering a reasonable range of draft alternatives.

The Corps asserts its SEIS complies with the APA and CWA.  Specifically, it alleges it selected the least environmentally-damaging, practicable alternatives of: (1) a deep-draft lock,

5

(2) hydraulic dredging, and (3) CDF disposal, while properly rejecting other alternatives considered.  The Corps also claims it properly concluded the Project satisfies State water quality standards.

### C.    Plaintiffs' Response

Plaintiffs filed a Response in opposition to the Corps' Cross-Motion for Summary Judgment.  (R. Doc. 195).  According to the Plaintiffs, the Corps was obligated to re-evaluate its 1997 EIS because the Court previously concluded that the Corps' 1997 EIS failed to take a hard look at the environmental impacts and consequences of dredging and disposal in light of changed circumstances stemming from the post-Katrina closure of the Mississippi River Gulf Outlet ("MRGO"), specifically the closure of the canal to deep-draft vessels.  Plaintiffs also challenge the SEIS on the basis that the Corps supports the analysis and findings therein upon post hoc rationalizations absent from the Administrative Record.  Finally, Plaintiffs refute that a letter from the State of Louisiana provides evidence of the Project's compliance with the State's water quality standards since the facts demonstrate otherwise.

### D.    Corps' Reply

The Corps filed a Reply brief in support of its Motion.  (R. Doc. 204).  The Corps contends NEPA does not require it to entirely reconsider shallow-draft alternatives in the SEIS since these alternatives were adequately evaluated and rejected in the EIS.  The Corps accuses Plaintiffs of improperly using NEPA to impose their desired result.  The Corps also re-urges its argument that Plaintiffs have failed to demonstrate it was arbitrary and capricious in applying the CWA Section 404(b)(1) guidelines.

### E.    Plaintiffs' Reply

Plaintiffs filed a Reply brief in support of their Motion.  (R. Doc. 207).  Plaintiffs raise

the following three arguments: (1) the Corps' insistence on a deep-draft lock is unexplained in

the record, (2) the Corps relies upon post-hoc rationalizations to support its position, and (3)

Congress did not require a deep-draft lock.

## III.    LAW & ANALYSIS

### A.    Standard of Review

#### 1.    *Motion for Summary Judgment*

Summary judgment will be granted only if the pleadings, depositions, answers to

interrogatories, and admissions, together with affidavits, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R.

Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986); *Brown v. City of Houston*, 337 F.3d 539, 540-41 (5th Cir. 2003).  A material fact is a fact

which, under applicable law, may alter the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ameristar Jet Charter, Inc. v. Signal

Composites, Inc.*, 271 F.3d 624, 626 (5th Cir. 2001).  A dispute is genuine when a reasonable

finder of fact could resolve the issue in favor of either party, based on the evidence before it.

*Anderson*, 477 U.S. at 250; *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th

Cir. 2002).  "The moving party bears the burden of demonstrating that there exists no genuine

issues of material fact."  *In re Vioxx Prods. Liab. Litig.*, 501 F.Supp.2d 776, 781 (E.D. La. 2007).

When considering a motion for summary judgment, the Court must "review the facts drawing all

inferences most favorable to the party opposing the motion."  *Gen. Universal Sys., Inc. v. Lee*,

379 F.3d 131, 137 (5th Cir. 2004).  If the party moving for summary judgment demonstrates the

absence of a genuine issue of material fact "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

Furthermore, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case on which they bear the burden of proof. *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). A non-movant's conclusory allegations or bare assertions unsupported by facts are insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48.

## 2. *APA Review of NEPA & CWA Claims*

Neither NEPA nor the CWA contain a standard for judicial review. The standard of review instead is set forth in the Administrative Procedure Act's ("APA") provision for review of final agency action, 5 U.S.C. § 706. *See Marsh v. Or. Natural Res. Def. Council*, 490 U.S. 360, 377 (1989); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). Under the APA, a court may only set aside agency actions "found to be...arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). The "arbitrary and capricious" standard is "highly deferential." *La. Crawfish Prods. Ass'n v. Rowan*, 462 F.3d 352, 355 (5th Cir. 1991)(quoting *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 678 (1992)). The standard contains a strong presumption in favor of upholding agency decisions made within the scope of the agency's expertise. *Or. Natural Res.*

8

*Def. Council*, 490 U.S. at 377; *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000).  An agency action is arbitrary and capricious only where "the agency has relied upon factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir. 1998).

Further, the standard is a narrow one and a court "should not substitute [its] own judgment for the agency's."  *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006)(citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  Though a court's review must be probing, it must only consider whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  If the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made," its decision must be upheld.  *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983); *Sierra Club v. Glickman*, 67 F.3d 90, 97 (5th Cir. 1995).

**B.    NEPA Claims**

*1.    NEPA*

Congress passed the National Environmental Policy Act ("NEPA") to focus governmental and public attention on the potential environmental effects of any proposed "major federal action."  *See* 42 U.S.C. § 4332; *Marsh v. Or. Natural Res. Def. Council*, 490 U.S. 360, 371 (1989).  "The NEPA process is intended to help public officials make decisions that are

based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). NEPA's statutory and regulatory mandate is "essentially procedural...It is to insure a fully informed and well-considered decision..." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978). The statute does not mandate a particular result, but instead prescribes that federal agencies consider the potential environmental consequences of proposed actions. *Methow Valley*, 490 U.S. at 350; *see also O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 228 (5th Cir. 2007)(quoting *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 224 (5th Cir. 2006)). While NEPA does not command agencies to select an environmentally preferable course of action, it does require the agency's decision to be "environmentally conscious." *Sierra Club v. Sigler*, 695 F.2d 957, 976 (5th Cir. 1983); *Holy Cross v. U.S. Army Corps of Eng'rs*, 455 F.Supp.2d 532, 537 (E.D. La. 2006). The decision to proceed with such an action is to occur only after an agency takes a "'hard look at environmental consequences.'" *Sabine River Authority v. U.S. Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992)(quoting *Methow Valley*, 490 U.S. at 350).

As a part of its procedural mandate, NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for any major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS is "a detailed statement" regarding such an action, containing:

> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. *Id.*

A supplemental EIS, which is at issue here, is used to evaluate and disclose environmental consequences of "new circumstances or information" that are significant and which have not been previously the subject of an original EIS. 40 C.F.R. § 1502.9(c)(1). In the Fifth Circuit, the following factors are generally considered by courts in evaluating an EIS: (1) whether the agency, in good faith and objectively, has taken a hard look at the environmental consequence of the proposed action and alternatives, (2) whether the EIS contains detail sufficient to allow parties, besides the preparing agency, to understand and consider the relevant environmental influences, and (3) whether the alternatives are sufficient to permit a reasoned selection therefrom. *See Sierra Club v. Froehlke*, 816 F.2d 205, 213 (5th Cir. 1987).

### 2.    *Failure to Consider Shallow-Draft Lock Alternatives in the SEIS*

The first NEPA objections raised by Plaintiffs pertain to the Corps' failure to consider shallow-draft lock alternatives in the SEIS, which only considers deep-draft lock alternatives. According to Plaintiffs, the Corps is obligated to explain why it failed to consider shallow-draft alternatives, since the Corps acknowledges deep-draft vessel traffic will not benefit from a deep-draft lock and a shallow-draft lock would produce the greatest net benefits over costs. Plaintiffs contend the Corps' conclusion that a shallow-draft and deep-draft would have very similar impacts is wrong because the Industrial Canal sediment is contaminated and a deep-draft lock requires dredging and disposing of almost twice as much contaminated sediment.

In response, the Corps argues that since NEPA is a procedural vehicle, only if it had selected the shallow draft alternative, which it did not, would it be required to evaluate the shallow draft impacts. The Corps claims that Plaintiffs' argument focusing on the overall volume

11

of material involved with a shallow-draft versus a deep-draft is a red herring, because as the

Corps' extensive evaluation demonstrates, the real issue is the degree of sediment contamination

and minimization of associated risks.  The Corps reaffirms its conclusion in the EIS that a deep-

draft is economically justified from an overall standpoint and it meets the Port of New Orleans's

("Port") objectives, and claims these conclusions remain valid even after closure of the MRGO.

The Corps also claims that Plaintiffs misunderstand the purpose of a supplemental EIS-to

supplement a previous EIS-and notes that it already considered shallow-draft alternatives in the

original EIS and is not required to rehash the same issues in the SEIS.

The omission of shallow-lock draft alternatives in the SEIS, which only considers deep-

draft lock alternatives, is at the center of the present motions, and the Court's findings thereon

will affect its findings, at least in part, on the other issues raised by the motions.  The Court

recognizes that the alternatives analysis "is the heart" of an EIS, thus an EIS must "rigorously

explore and objectively evaluate all reasonable alternatives" and "[d]evote substantial treatment

to each alternative."  40 C.F.R. § 1502.14(a)-(b).  At the same time, the Court is mindful of its

requirement to afford great discretion to an agency in such an analysis.  *See Gulf Restoration*

*Network,* 452 F.3d at 368.

Another issue the Court bears in mind is that the Plaintiffs are challenging the Corps'

SEIS, a "supplement" of the EIS which did consider shallow-draft alternatives.  Thus, the Court

must determine whether the Corps was required to re-evaluate the shallow-draft alternatives in

the SEIS.  The Corps is required to supplement the earlier EIS with "significant new

circumstances or information relevant to environmental concerns and bearing on the proposed

action or its impacts."  40 C.F.R. § 102.9(c)(1)(ii).  Consistent with this requirement, in dicta,

12

this Court's previous Order & Reasons required that the Corps, "at a minimum, must prepare a supplemental EIS addressing the significant new circumstances relevant to environmental concerns that have arisen since Hurricane Katrina." *See* (R. Doc. 107, p. 13 n.4).

The Court finds that the closure of the MRGO to deep-draft traffic is a "significant new circumstance" for purposes of a supplemental EIS, and by failing to address the impact of this in the SEIS draft alternatives, the Corps has violated NEPA.  The Corps claims that the closure does not raise NEPA concerns with its decision to consider and select from only deep-draft locks in the SEIS since accommodating deep-draft traffic in the lock remains consistent with the Port's goals and a deep-draft lock is economically and environmentally justified.  These claims may very well be true, but as discussed below, the evidence in the Administrative Record is absent of sufficient data or analysis to support them and even contains contradictory evidence.

a.       Inconsistent Positions of the Corps

Beginning with the 1997 EIS, shallow draft alternatives were rejected in large part because the Port at that time sought to better accommodate deep-draft traffic with the new lock. Indeed, the EIS selected the deep-draft lock reasoning "[t]he 36-foot lock depth is compatible with the controlling depth of the MRGO and would allow deep-draft vessel using the MRGO and docks along its banks, to pass to and from the Mississippi River."  (R. Doc. 176-4).  The 1997 EIS also concludes "[o]n an overall basis, a deep-draft lock, generally compatible with MR-GO traffic, is economically justified and therefore is being recommended for construction."  (R. Doc. 192-7).  The deep-draft lock was the "Locally Preferred Plan" in the 1997 EIS, that is the plan selected by the Port as the local sponsor of the project.  (R. Doc. 176-4).  The selection of the deep-draft lock went against the National Economic Development Plan selection of a shallow-

draft lock even though the shallow-draft "produces the greatest net benefits over costs of any of the plans considered in detail.  It is considered to be a socioeconomically and environmentally acceptable plan."  *Id*.

The 2009 SEIS declares as its purpose "to determine the best action for relieving navigation traffic congestion associated with the existing [lock]."  (R. Doc. 157)(SEIS, p.1). With regard to the new recommended deep-draft plan in the SEIS, the Corps states that it is the same as the deep-draft plan selected in the 1997 EIS except for some changes regarding the CDF, the off-site construction area, and disposal, but does not mention any changes to the type of traffic which will utilize the new lock.  *See id.*  The SEIS, however, at the same time recognizes its obligation pursuant to this Court's Order to "describe the changes in existing conditions after Hurricane Katrina and analyze impacts on the post-Hurricane Katrina human and natural environment."  *Id*. at p. 23.

Of particular importance to the present motions is the section in the SEIS entitled "Waterborne Transportation."  *Id*. at p. 73-78.  Therein, the SEIS states that "[t]he lock primarily serves shallow-draft barge traffic; however, a limited number of deep-draft vessels (to a depth of 31.5 feet) are accommodated."  *Id*. at 73.  The SEIS recognizes "Congress's deauthorization of the deep-draft channel," *see id*. at 77, and states "it is anticipated that an increase in use of the IHCN Lock by deep-draft traffic would occur with the closure of the MRGO."  *Id*. at 78.  The SEIS assumes deep-draft traffic will be using the new lock.  *See e.g.* p. 78.

Inconsistently, the Corps' response to Public Comments and its Updated Economic Analysis indicate that because of the closure of the MRGO to deep-draft traffic, deep-draft traffic will not be utilizing the new lock.  In the Public Comments the Corps states,

14

> While future demand for deep draft lockages through the IHNC lock may arise, none
> appears to exist following the closure of the MRGO.  This SEIS assumes that shallow
> draft traffic would increase and deep-draft traffic would essentially remain at zero.  If
> after construction, deep-draft traffic increase, the realized benefits could be greater than
> the predicted benefits.  (R. Doc. 192-20).

Similarly, the Corps stated in response to other public comments in 2009,

> With the closure of the MRGO, there will be no route for deep-draft vessels to service
> existing and future industries on the IHNC.  Based on trends in deep-draft traffic
> following hurricane Katrina, the cost benefit analysis assumes that the benefits of the
> recommended plan to deep-draft traffic would be non-existent.  (R. Doc. 176-9).

In the Corps' 2008 Updated Economic Analysis it provides,

> [T]he deep draft activities that supported the deep draft benefits identified in the 1997
> Evaluation Study and 2005 Investigative Study are no longer occurring.  While future
> demand for deep draft lockages through the IHNC lock may arise, none appears to exist
> in the present aftermath of the MRGO's closure.  Therefore, this SEIS assumes no deep
> draft benefits associated with the authorized plan over the period of analysis.  (R. Doc.
> 192-22).

### b.    Conclusions Regarding a Deep-Draft Lock

Based upon the foregoing the Court is able to draw some important conclusions.  First,

the deep-draft lock was selected by the Corps in the 1997 EIS to accommodate deep-draft traffic.

Second, the SEIS incorporates this conclusion, but at the same time acknowledges the MRGO is

closed to deep-draft traffic; this is both inconsistent and illogical.  Whether deep-draft traffic will

utilize the new lock and whether the draft alternatives should be reconsidered in light of this

utilization or prohibition thereof must be clarified in an amended SEIS.  The claims made during

this litigation by the Corps regarding the type of traffic which will use the new lock and the

effects of this traffic upon the type of drafts considered and selected are insufficient to clarify

these matters.  As the Plaintiffs correctly note, the Corps' post hoc claims, outside the

Administrative Record, are insufficient to pass muster under NEPA.  *See Sierra Club v.*

*Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007)("'Post-decision information may not be advanced as a new rationalization either for sustaining or attacking an agency's decision.'"); *Sierra Club v. Froehlke*, 816 F.2d 205, 212 (5th Cir. 1987)("As a general matter, we do not condone post hoc review of, or rationalizations for, decisions already made.").  Indeed, the Court's review is limited to the evidence in the Administrative Record, absent certain circumstances, none of which are urged by the Corps.  *See Indep. Turtle Farms of La., Inc. v. United States*, 707 F.Supp.2d 604, 611 (W.D. La. 2010)("[C]ourts typically must not review evidence outside of the administrative record."); *Tex. Comm. on Natural Resources v. Van Winkle*, 197 F.Supp.2d 586, 595 (N.D. Tex. 2002)("[T]he administrative record provides the complete factual predicate for the Court's review.").  One focus of NEPA is to provide information to the public so it can play a role in the decision making process, *see Sabine River*, 951 F.2d at 676; this is compromised by the contradictory information in the Administrative Record regarding the closure of the MRGO to deep-draft traffic.  On its face this seems to be the proverbial bridge to nowhere; namely, constructing a deep-draft lock which will never be used by deep-draft traffic.

The Corps claims that a shallow-draft lock will not meet the Port's objectives, and thus it does not have to reconsider shallow-draft alternatives.  Indeed, "NEPA permits the agency to determine which alternatives are feasible based on the programmatic goals of the agency."  *Id.* (citing *City of Carmel-by-the-Sea v. Dep't of Transportation*, 123 F.3d 1142, 1155 (9th Cir. 1997)); *see also Sierra Club v. Marsh*, 714 F.Supp,. 539, 574 (D. Me. 1989).  Enabling the Port to efficiently and properly accommodate the vessels which utilize its services is certainly a programmatic goal of the Project.  However, in light of the evidence in the Administrative

Record indicating deep-draft traffic will not be using the new lock, the Corps must reconsider whether the Port's desire for a deep-draft lock still weighs as heavy in the current NEPA analysis.  As noted above, the defect in the SEIS NEPA analysis is not the consideration of the Port's interests but the failure to sufficiently consider these interests and other relevant interests in light of the closure of the MRGO to deep-draft traffic.

With the economic and business basis for the deep-draft preferred alternative in question, the Corps should revisit its previous finding that the dredging necessary for a deep-draft lock involves almost twice as much sediment as that for a shallow-draft lock.  *See* (R. Doc. 176-4, Table 9).  The Corps should also explain and/or clarify in the amended SEIS why, as it claims in its briefing, this larger amount of sediment does not result in greater environmental damage. These concerns are not inconsequential and should inform the Corps' decision as to the preferred draft alternative.

### 3.     *Rejection of Bucket Dredging*

Plaintiffs next argue that the SEIS improperly rejects bucket dredging in favor of more environmentally-damaging hydraulic dredging.  According to Plaintiffs, the Corps premised its hydraulic dredging selection on two faulty bases: (1) that too much sediment would be involved for bucket dredging, yet did not consider that a shallow-draft lock would reduce the amount of sediment, and (2) hydraulic dredging is necessary to meet the project schedule, even though the Corps lacks financing to go forward with the Project and the Corps failed to consider whether bucket dredging on a shallow-draft lock would meet the proposed schedule.

In response, the Corps claims that it properly rejected bucket dredging.  According to the Corps, hydraulic dredging was selected because of the magnitude of the Project and as compared

to bucket dredging, hydraulic dredging has a higher rate of production.

There is discussion of both hydraulic and bucket dredging in the SEIS.  For example, it provides,

> Hydraulic dredging methods would be used primarily because of the rate of production from hydraulic dredges compared to bucket dredges.  Hydraulic dredges typically have a rate of production that is an order of magnitude greater than bucket dredges (thousands of cubic yards (cy) per hour for a hydraulic dredge vs. hundreds of cubic yards per hour for a bucket dredge [USACE 1983]).  Given the large volumes of material proposed to be dredged over the life of the project, hydraulic dredging would be the likely choice of a construction contractor.  Also, bucket dredging (i.e. clamshell) generates higher turbidity than hydraulic dredging.  During bucket dredging, sediment resuspension occurs when the bucket impacts the bottom and is pulled back through the water column, and then out of the water, as turbid water spills out of the bucket or through leaks in openings between the jaws (USACE 1983).  The turbidity impacts from a bucket dredge can be reduced through the use of a watertight bucket, but this further reduces the rate of dredging production.  (R. Doc. 157)(SEIS, p. 48).

The SEIS also states,

> Because of the large volume of material that would be dredged for lock construction, hydraulic dredging, which allows for the pumping of material to a temporary or permanent disposal site, would be necessary to meet the project schedule.  As described previously, bucket dredging is a substantially slower method and dredged material must be handled twice in order to temporarily or permanently dispose of the material." *Id*. at p. 57.

As indicated by these provisions in the SEIS, the Corps considered a number of factors in selecting hydraulic dredging over bucket dredging, including efficiency, productivity, contractor preference, and turbidity.  "Reasonable alternatives [under NEPA] include those that are practical or feasible from the technical and economic standpoint."  CEQ Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed.Reg. 18026-1, 18027, 1981 WL 149008 (F.R. 1981).  Feasibility is concerned with whether a particular alternative can meet the goals of the proposed action.  *See Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 436 (5th Cir. 1981).  An EIS may include "factors not

related to environmental quality, which are likely to be relevant and important to a decision."  40

C.F.R. § 1502.23.  NEPA "does not command the agency to favor an environmentally preferable

course of action, only that it make its decision to proceed with the action after taking a 'hard

look at environmental consequences.'" *Sabine*, 951 F.2d at 676.

Thus, based upon the foregoing, it was appropriate for the Corps to select hydraulic

dredging even if it is not the most environmentally-sound dredging method.  However, if in

amending the SEIS to include consideration of the closure of the MRGO to deep-draft traffic, the

Corps finds that this closure will have an impact upon the dredging methods it considered and

ultimately selected it should discuss how and determine whether this changes its preference of

hydraulic dredging.

4.     <em>Rejection of Landfill Disposal for Contaminated Sediment</em>

Plaintiffs also argue that the SEIS improperly rejects landfill disposal in favor of using a

confined disposal facility ("CDF").  Plaintiffs claim the Corps improperly rejected landfill

disposal on the basis of cost alone and failed to consider that if used in conjunction with a

shallow-draft lock, the cost of the more environmentally-sound landfill disposal would be

reduced.  Plaintiffs also claim that the CDF was not properly examined for the potential of

overtopping in the event of flooding.

With regard to its selection of the CDF, the Corps argues that it did properly consider

costs and concluded that such a facility costs substantially less than landfill disposal.  The Corps

also notes that the CDF will be located within the New Orleans Hurricane and Storm Damage

Risk Reduction Systems ("HSDRRS"), which is protected by levees with 15-17 foot crest

elevation, and that it did evaluate the potential for overtopping, as well as catastrophic failure

19

with the CDF.   The Corps claims that disposal of either kind would require a temporary CDF, and landfill disposal will not necessarily reduce the level of hurricane and storm damage risk.

The SEIS contains substantial information regarding disposal facilities.  For example, the SEIS concludes that "the conceptual design for the CDF would safely fulfill storage and ponding requirements, and the CDF would be protected by the [HSDRRS]."   (R. Doc. 157)(SEIS, p. 5). It further provides that the CDF would not change the risk of flooding.  All levees and floodwalls that would be realigned for project construction would be built to current design standards." *Id.* at p. 7.  Also, "[t]he primary purpose of a CDF is to provide for structural containment of the dredged material; however, necessary hurricane protection measures were considered in the CDF design." *Id.* at 50; *see also id.* at p.158.

> With regard to overtopping, the SEIS provides,
>
> The placement of the CDF behind the HSDRRS would provide it with the 100-year level of risk reduction.  However, because flooding has occurred in this area previously as a result of levee failure, the conservative approach would be to model the potential for overtopping in the event of widespread flooding.  Although this modeling effort has not been completed, a preliminary analysis suggests that the maximum depth of flooding in the area of the proposed CDF would be 10 feet, and the modeled height of 15 feet would be adequate to prevent overtopping of the CDF dike in the unlikely event of catastrophic flooding. *Id.* at p.50.

It also states, "the completion of the HSDRRS would insure that all components of the project would have 100-year level of risk reduction, including the CDF, and new design criteria for levees and floodwalls would ensure that overtopping of levees and floodwalls would not cause catastrophic failure.  The CDF would be protected from storm surge and wave run-up by these structures." *Id.* at p.80.  The Administrative Record contains analysis as to the effects of catastrophic and non-catastrophic failure on the CDF. *See* (R. Doc. 192-19).

With regard to landfill disposal, the Corps noted "a number of limitations" in the SEIS,

including the increased cost when compared with CDF disposal ($75-131 for landfill versus $23-45 for CDF), the likelihood that dredged material would have to be placed in a CDF prior to the landfill to "dewater" for several years, disposal of dredged material in a landfill would potentially reduce the landfills' life span, and landfills have the same level of hurricane and storm damage risk reduction as CDFs.  *Id*. at 53, 55; *see also id.* at p.142.

While the focus of the EIS is environmental concerns, in considering reasonable alternatives an agency is also permitted to consider practicality or feasibility from a technical and economic standpoint.  *See* CEQ Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed.Reg. 18026-1, 18027, 1981 WL 149008 (F.R. 1981).  Feasibility is concerned with whether a particular alternative can meet the goals of the proposed action.  *See Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 436 (5th Cir. 1981).  An EIS is to include "factors not related to environmental quality, which are likely to be relevant and important to a decision."  40 C.F.R. § 1502.23.  The Fifth Circuit has recognized that economic considerations are included within such factors, stating that "[i]n order to fully appraise the potential environmental harms of a proposed project, they must be weighed against the economic benefits of that project.  *S. La. Envtl. Council, Inc. v. Sand,* 629 F.2d 1005, 1011 (5th Cir. 1980).

The Corps did not violate NEPA by selecting, at least in part, the CDF based upon the lower costs of this alternative as compared with the landfill alternative.  Additionally, the Corps puts forth a number of reasons other than cost for selecting the CDF.  Contrary to Plaintiffs' claims, the Corps did evaluate the CDF for overtopping potential, as well as the effects of other catastrophic events upon the facility.  Thus, the Corps' disposal alternatives consideration and

selection passes muster under NEPA.  Nonetheless, because the Corps is now required to reconsider its draft alternatives analysis in light of the closure of MRGO to deep-draft traffic, if this closure will have an impact upon its consideration of disposal alternatives and the selection of the CDF, the Corps should incorporate such in its amended SEIS.

### C.    CWA Claims

#### 1.    *404(b)(1) Guidelines*

The Clean Water Act establishes a comprehensive program to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve that objective, Section 301(a) of the Act prohibits the "discharge of any pollutant by any person" except "as in compliance with" specified provisions of the Act.  33 U.S.C. § 1311(a).  The Act provides for permitting programs that allow discharge of pollutants in compliance with its provisions.  One such program authorizes the Corps to issue permits pursuant to 33 U.S.C. § 1344 for discharge of dredged or fill material into navigable waters.

Under the Corps' permitting program, it is authorized to issue discharge permits for either specific disposal sites or general permits on a state, regional, or nationwide basis.  *See* 33 U.S.C. § 1344.  The Corps is required to follow "special policies, practices, and procedures...in connection with the review of applications" for these permits.  33 C.F.R. § 323.1.  These general policies and procedures are found in 33 C.F.R. §§ 320, 325, *et seq*.  The Corps' "decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest."  33 C.F.R. § 320.4(a).  Additionally, "a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's

404(b)(1) guidelines." *Id.*

When the Corps itself is seeking to implement dredge-and-fill projects, it must also comply with the 404(b)(1) guidelines. *See* 33 C.F.R. § 336.1(a). Indeed, "the Corps authorizes its own discharges of dredged or fill material by applying all applicable substantive legal requirements, including public notice, opportunity for public hearing, and application of the section 404(b)(1) guidelines". *Id.*

The 404(b)(1) guidelines aim to fulfill the goal of the CWA though "control of discharges of dredged or fill material," 40 C.F.R. § 230.1, and apply "to the specification of disposal sites for discharges of dredged or fill material into waters of the United States." 40 C.F.R. § 230.2. These guidelines prohibit "discharge of dredged or fill material" where "there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* at § 230.10(a)(2). When the activity associated with a discharge is not water dependant, "practicable alternatives that do not involve special aquatic sites are presumed to be available." *Id.* at § 230.10(a)(3). Additionally, discharge or dredging of fill material is prohibited if it "[c]auses or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard." *Id.* at §230.10(b)(1). Furthermore, except in certain circumstances, "no discharge of dredge or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." *Id.* at § 230.10(c).

Plaintiffs raise two arguments under the CWA, each of which the Court now addresses.

2.       *Failure to Select Least Environmentally Damaging Alternatives*

Plaintiffs argue the Corps has violated the CWA 404(b)(1) guidelines by failing to select the least environmentally-damaging alternatives.  First, Plaintiffs claim that the Corps improperly selected a deep-draft lock instead of a shallow-draft which would reduce the amount of sediment dredged and disposed of by approximately one-half.  Second, Plaintiffs claim the Corps improperly selected hydraulic dredging instead of bucket dredging which minimizes re-suspension of sediment and when combined with a shallow-draft lock, would require less time and dredging.  Third, Plaintiffs allege the Corps improperly selected a CDF instead of the less environmentally-damaging disposal alternative of landfill disposal.

In response, the Corps argues that it selected the least environmentally-damaging, practicable alternatives as required by the CWA.  It claims that it reasonably rejected a shallow-draft lock in favor of a deep-draft lock on the basis that the latter would allow for safe and proper functioning of the lock, provides the greatest net benefits over costs, and is a socioeconomically and environmentally acceptable plan.  The Corps refutes the Plaintiffs' claim that because the shallow-draft involves dredging less sediment it is less damaging than a deep-draft lock; rather, according to the Corps, a lesser amount of dredged material will not materially reduce the Projects' disposal impacts on wetlands.  It also claims a shallow-draft would not comport with the Port's goals for the project.  Finally, the Corps claims that it properly rejected bucket dredging and landfill alternatives on the bases of cost and logistics.

With regard to the CWA 404(b)(1) guidelines' alternatives, agencies are to consider "if there is a practicable alternative to the proposed discharge which would have less adverse impact

24

on the aquatic ecosystem." 40 C.F.R. § 230.10(a).  An alternative is "practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.*  For actions subject to NEPA...the analysis of alternatives for NEPA environmental documents...will in most cases provide the information for the evaluation of alternatives under these Guidelines." *Id*.  This is the case here.

As noted, Plaintiffs challenge the Corps' alternatives analyses and selections in the SEIS, specifically those pertaining to the deep-draft lock, hydraulic dredging, and confined disposal facility.  Considering the CWA's 404(b) guidelines, for many of the same reasons discussed in the NEPA section above, *see supra* pp. 11-17, the Corps' consideration and selection from only deep-draft lock alternatives without considering the MRGO is closed to deep-draft traffic violates these guidelines.  The Corps claims that the deep-draft comports with the Port's purpose, but the Administrative Record indicates this purpose may no longer be valid.  While there is debate between the parties as to the environmental impacts of a deep versus shallow draft, even the Corps concedes that there will be less sediment dredged and stored with a shallow draft.  Notably, the EIS concluded a shallow-draft provides the greatest net benefit over costs of any draft alternatives.  It also found a shallow-draft to be a socioeconomically and environmentally acceptable plan.  These issues warrant reconsideration of the draft alternatives in the SEIS since it is questionable whether a deep-draft lock remains "practicable."

With regard to the Corps' consideration and selection of dredging and disposal alternatives, because the Corps considered environmental, economic, and practical concerns for these alternatives, *see supra* pp. 17-21, the Court finds the Corps has satisfied the CWA alternatives requirement in this regard.  However, as the Court found with NEPA, if the Corps

finds that the closure of the MRGO to deep-draft traffic changes its dredging and disposal alternatives consideration and selection, it should amend the SEIS to include such considerations.

>    *3.      Applicable Louisiana Water Quality Standards*

Plaintiffs also argue the Corps has violated the CWA because its proposed discharge violates an applicable Louisiana water quality standard.  According to the Plaintiffs, the Corps has admitted that its discharge will violate this standard and concedes it is required to obtain a waiver.  In response, the Corps claims that it has applied for and obtained a Water Quality Certification from the State, which provides that the disposal of dredge sediment will not violate the water quality standards of Louisiana.

The CWA 404(b)(1) guidelines prohibit the discharge of dredged material if such discharge, "[c]auses or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard."  40 C.F.R. § 230.10(b)(1).  Further, the Corps is required to obtain from the State certification that any such discharge complies with the State's water quality standards.  *See* 33 U.S.C. § 1341(a)(1).

Here, the Corps obtained a "Water Quality Certification" from the State of Louisiana, Department of Environmental Quality, Environmental Services, which is made part of the Administrative Record, and states,

> The requirements for Water Quality Certification have been met in accordance with LAC 33:IX.1507.A-E.  Based on the information provided in your application, we have determined that the placement of the fill material will not violate the water quality standards of Louisiana provided for under LAC 33:IX.Chapter 11.  Therefore, the Department has issued a Water Quality Certification.  US641585.

Thus, the Corps has satisfied its requirement for obtaining certification from the State.  Any

ambiguity in the Administrative Record, particularly the SEIS, as to the satisfaction of this requirement should be clarified by the Corps.

>    **D.    The Court's 2006 Order**

Plaintiffs also argue the SEIS violates the Court's 2006 Order & Reasons.  *See* (R. Doc. 107).  The Court agrees to the extent the SEIS fails to sufficiently and properly consider the impact of the closure of the MRGO to deep-draft traffic upon the Project, particularly the depth of the draft, and how this depth may affect dredging and disposal alternatives.

## IV.    CONCLUSION

For the foregoing reasons, IT IS ORDERED that Plaintiffs' Second Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART and the Corps' Cross-Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.  Consistent with this Order & Reasons, the SEIS and ROD are vacated and remanded and the Corps is enjoined from continuing with the Project until it complies with NEPA and the CWA.

New Orleans, Louisiana this 9th day of September 2011.

_____
U.S. District Judge